EDWARDS LAW OFFICE, P.C.
Jack D. Edwards, 6-3877
Kaden B. Canfield, 7-6238
PO Box 5345
Etna, WY   83118
307.883.2222
Fax:   307.883.0555
jack@edwardslawofficepc.com
kaden@edwardslawofficepc.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| BENJAMIN D. BURKS, an individual,<br><br>Plaintiff,<br>v.<br><br>TANNER MATTHEW QUICK, an individual, TARYN MATTHEW SCIORTINO, an individual, and JOHN/JANE DOE DETENTION OFFICERS 1–10, individually,<br><br>Defendants. | Civil No.: 1:26-cv-00047 |

## PLAINTIFF'S FIRST COMPLAINT

**COMES NOW**, Plaintiff Benjamin D. Burks, ("Ben"), an individual, by and through the undersigned counsel, and respectfully files this First Complaint against Defendants, alleges as follows:

### I.  INTRODUCTION

1.      On July 7, 2023, Benjamin Burks was 19 years old.   He worked at the Historic Hotel Irma in Cody, Wyoming.   An arrest warrant from New Mexico was out for his arrest on a

1

nonviolent offense.  Cody Police Officers contacted Ben, took him into custody and transported him, without incident, to the Park County Detention Center (PCDC) at 1402 River View Drive, Cody, Wyoming.

2.      He was detained in the lowest-level offender unit, housed with "weekenders" who were permitted to come and go from the inmate pods.   Ben was incarcerated from that day until July 30, 2023.

3.      During his time at the facility, Ben maintained a clean disciplinary record and consistently demonstrated good behavior.   He was granted the privilege of relaxed, communal dormitory-style confinement, where he could watch TV, play games, and interact directly with other inmates.   He had access to the library to read novels and self-improvement literature.   He also had access to the recreation yard, which included a basketball hoop and balls.

4.      Ben had no previous negative interactions with staff and no problems during his stay.   He exhibited predictable, respectful, and courteous behavior towards staff throughout his time at the facility.

5.      According to Deputy Taryn Sciortino, Ben was not considered a problem inmate. Deputy Tanner Quick felt he could talk to Ben one on one because he never had any issues with Ben.  Sgt. Cathy Thomas believed that Ben was one of the "nicest people" at the facility.   He was, "so compliant and so nice the whole time."

6.      Then one day, Ben was frustrated.   He had been sitting in jail for 23 days.   He did not know when he would be extradited or seen by the New Mexico judge.   He was largely 'kept in the dark' about when he would be moved due to security concerns of the facility, but this was never explained to him.   He was having a bad day.   Ben went into the 'rec yard' of the facility to get his frustration out.   While there he threw the handball.   He bounced the

2

basketball.   He punched the basketball and he kicked the basketball.   Seeing that he was violating jail rules, Deputy Sciortino got on the intercom, warned Ben and admonished him to stop kicking the ball.   Ben did not heed the warning.   Then over the screetchy intercom Deputy Sciortino ordered him to his cell.

7.      Ben complied, flipping the camera "the bird" on the way out the door.

8.      Deputy Sciortino dispatched Deputy Quick to the jail cell to check things out. Give Ben a stern talking to.  When Quick arrived, **Ben was alone in the cell**.

9.      Ben tells him to go away.   He wants to be alone and take a moment for himself. Who could he hurt?

10.     Quick is the authority and stays put.   Ben refuses to talk.   He just wants to be left alone.   Quick is not going away.   He tells Ben to get on his knees.   Ben refuses.   "On your knees!"  "No!"   Quick escalates force, he pulls out his taser.   With the green laser on his chest, Ben complies.

11.     Ben is on his face and Deputy Quick plunges a stiff knee in his back. Overpowered and outweighed, Ben complies and is cuffed.  Deputy Quick squeezes the cuffs on real tight.  No double lock.  Ben winces in pain and objects.   Ben tells Deputy Quick that he has a plate in his wrist, but Deputy Quick does not care to listen.

12.     Then Ben is picked up and slammed against the short wall.

13.     Where were they going to take him?   To another cell to be alone and isolated?

14.     Deputy Sciortino arrives and assists Deputy Quick with the pat down.  "Kick off your shoes!"   A frustrated Ben kicks his shoes, and they hit the opposite wall.   Sciortino goes to check Ben's leg and Ben kicks his leg again.   "Don't do that again!"  Ben complies again.

15.     Once it is clear that Ben was no longer a threat and securely handcuffed, Sciortino leaves Deputy Quick alone with Ben and heads over to turn off the TV.

16.     Actions speak louder than words and the official's action illustrated that Ben was no longer an immediate threat.

17.     Before Sciortino returns from TV duty, Deputy Quick forcefully pulls Ben away from the wall and thrusts him towards the jail cell door.   Jolted by the shove, the deputy's momentum lifted Ben up in the air and Quick, immediately assisted by Sciortino, violently thrust Ben, handcuffed, to the floor, face first.

18.     His hands were behind his back; he could not brace his fall.

19.     Ben's face smashed into the cold, unforgiving slab of concrete—a surface as hard as granite, typical of correctional facilities.

20.     The impact was violent and absolute, as if he had collided with the very bedrock of the building itself.

21.     Bloody teeth shot across the floor.  There he laid, face down in a pool of blood, snoring.   He was out cold.

22.     During the DCI investigation Special Agent Reece conducted an interview of Sgt. Catherine Thomas, the supervisor on duty, and reported the following:

SA Reece asked Sergeant Thomas what she meant by "Doesn't look good." Sergeant Thomas told SA Reece, "From the beginning of it when he was standing on the half wall watching TV, Donaldson took the other two (2) guys out. Quick walked into the cell and shut the door. You couldn't see Quick but you could see they were talking. He (Burks) wasn't aggressive, wasn't arguing. Of course we didn't have audio, but he wasn't doing anything aggressive at all. Then all of a sudden I saw the taser. My opinion it did not look good. We talk people down, it didn't even look like, his body language he did not need to be talked down."

Sergeant Thomas said that Burks "goes down on the floor, compliantly, he gets cuffed." Sergeant Thomas continued, "He gets him up, Sciortino comes and they are pat searching him. He (Burks) is starting to get agitated. When they put him on the wall, they kind of slam him on the wall." Sergeant Thomas said that she personally thought that was unnecessary, "even if he is talking, we get called things all the time. That's part of our job."

Sergeant Thomas told SA Reece, "if he was being so aggressive or so bad, why did Sciortino walk away, turn the TV off and come back. My personal opinion it was all unnecessary." Sergeant Thomas said, "They start walking towards the door and I see Quick aggressive with him again. From the hallway you could see it got more aggressive. They picked him up from the feet and arms, and he went down. When he walked in there personally speaking, the fifteen years I've been in this but were all different, if he had went in there and went hey what's wrong. You've been here for a month, you've been one of the nicest people here. Is something wrong? And if I would have said that and he said fuck off, I don't want to talk right now. Okay, if you need anything let me know. He was in there by himself, he had nobody else with him. He wasn't a threat to anybody, he just fuck off. Okay he was pretty sure the transport team was coming soon, maybe he didn't want to go. Maybe he was getting nervous."



23.     That is what he apparently deserved for kicking a basketball and flipping off the camera.

24.     Ben's injuries were so serious that the professionals at Cody Regional Health determined his condition was more than they could handle.

25.     CT imaging of Ben's head, face, and cervical spine revealed multiple fractures of his face including:   nasal fracture, right maxillary sinus fracture, and left mandibular condyle fracture.   Due to the extensive nature of his severe injuries, Ben was transferred to the Billings Clinic Hospital in Billings, Montana as a Level 2 Trauma Patient.

26.     He had life-threatening injuries.

27.     He was diagnosed at the Billings Clinic Hospital with the following:

| Code | Description |
| --- | --- |
| S02.42XA | Fracture of alveolus of maxilla, initial encounter for closed fracture |
| S02.612A | Fracture of condylar process of left mandible, initial encounter for closed fracture |
| S02.622A | Fracture of subcondylar process of left mandible, initial encounter for closed fracture |
| S02.42XA | Fracture of alveolus of maxilla, initial encounter for closed fracture Secondary |
| S02.612A | Fracture of condylar process of left mandible, initial encounter for closed fracture |
| S02.622A | Fracture of subcondylar process of left mandible, initial encounter for closed fracture |
| S01.111A | Laceration without foreign body of right eyelid and periocular area, initial encounter |
| S01.81XA | Laceration without foreign body of other part of head, initial encounter |
| K08.419 | Partial loss of teeth due to trauma, unspecified class |
| Y04.0XXA | Assault by unarmed brawl or fight, initial encounter |
| Y92.149 | Unspecified place in prison as the place of occurrence of the external cause |

28.     Ben had extensive facial restorative surgery.

29.     Since returning to Texas, he has undergone several oral surgeries to assist in replacing his four missing front teeth.   Specifically, a bone graft on his maxilla #6-10 in order to have implants placed.

30.    These brutal injuries suffered at the hands of Deputy Quick and Deputy Sciortino left Ben permanently disfigured and scarred on his face.   He has been treating with a psychiatrist and therapy to help with the stress and anxiety this violence has caused and continues to suffer severe emotional distress as a result of being permanently disfigured in his face.

31.    This suit follows.

## II.  PARTIES

32.    Plaintiff realleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

33.    Plaintiff Benjamin D. Burks is a citizen of the United States and, at all relevant times, was domiciled in the State of Texas.

34.    Defendant Tanner Matthew Quick was at all relevant times a detention officer employed by the Park County Sheriff's Office, acting under color of state law.   He is sued in his individual capacity.

35.    Defendant Taryn Matthew Sciortino was at all relevant times a detention officer employed by the Park County Sheriff's Office, acting under color of state law.   He is sued in his individual capacity.

36.    Defendants John/Jane Doe Detention Officers 1–10 are detention officers or supervisors whose identities are presently unknown but who participated in, witnessed, authorized, failed to prevent, or later ratified the unconstitutional conduct described herein.  They are sued in their individual capacities.

## III.  JURISDICTION AND VENUE

35.    Plaintiff realleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

36.    This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. §§ 1983 and 1988.

37.    This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367, as those claims arise from the same nucleus of operative facts.

38.    Venue is proper in this District under 28 U.S.C. § 1391(b) because all events giving rise to the claims occurred in Park County, Wyoming.

39.    On or about February 15, 2025, a Notice of Claim was served upon Defendant Quick by Certified Mail, Return Receipt Requested No.: 95890710527007243 69824 and received by Park County Sheriff's Office Lieutenant Joseph Torczon in compliance with the Wyoming Governmental Claims Act, including W.S.§ 1-39-113(c)-(d), and in compliance with the signature certification requirements of Article 16, Section 7 of the Wyoming Constitution.

## IV.    FACTUAL ALLEGATIONS

40.    Plaintiff realleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

41.    In July 2023, Plaintiff was detained at the Park County Detention Center on an out-of-state warrant for a non-violent offense.

42.    By July 31, 2023, Plaintiff had been held for approximately twenty-three (23) days without a clear timeline for extradition or judicial review.

43.    On July 30, 2023, Plaintiff was in the recreation yard when he was admonished for a minor rule infraction involving a basketball.

44.    Plaintiff complied with instructions to return to his housing pod. While doing so, he made a non-verbal gesture toward a security camera expressing frustration.

8

45. After Plaintiff returned to the housing pod and was alone, Defendant Quick was summoned to speak with him.

46. Plaintiff was visibly upset but did not physically threaten, advance toward, or attempt to harm any officer.

47. Plaintiff verbally expressed frustration and used profanity toward Defendant Quick.

48. Rather than attempting de-escalation, Defendant Quick ordered Plaintiff to "cuff up" and get on the ground.

49. Defendant Quick escalated the encounter by unholstering his taser and pointing it at Plaintiff's chest, despite the absence of any immediate threat to anyone.

50. Plaintiff then voluntarily complied, went to the ground, and placed his hands behind his back.

51. Defendant Quick handcuffed Plaintiff as Defendant Sciortino entered the housing pod.

52. Defendant Quick intentionally tightened the handcuffs excessively, failed to double-lock them, and ignored Plaintiff's complaints of severe pain and a pre-existing wrist injury involving a metal plate.

53. Defendant Quick lifted Plaintiff to his feet and slammed him into a half wall to frisk him.

54. Defendant Sciortino assisted with a pat-down search.

55. While Plaintiff's hands were cuffed behind his back, Defendant Sciortino instructed him to remove his shoes and lift his leg.

9

56.     Plaintiff attempted to comply with the instruction but did so wrongly, given his restrained position.  In removing his shoes, his movement was forceful and was perceived by Defendant Sciortino as an attempted kick, though Plaintiff did not intend any assaultive conduct.

57.     Defendant Sciortino then walked away, leaving Defendant Quick alone with Plaintiff.

58.     Clearly there was no threat. While Plaintiff was handcuffed, compliant, unarmed, and not resisting – actively or passively – Defendant Quick shoved him toward the door with sufficient force to lift the Plaintiff off his feet.

59.     Faced with an immediate threat of serious bodily injury, a well-grounded fear that the threat would be carried out, and no reasonable opportunity to brace for impact, Plaintiff experienced involuntary shaking and flailing consistent with a life-preserving response to extreme danger.

60.     After Plaintiff was involuntarily and forcibly lifted, causing him to lose his footing, Defendant Sciortino returned and assisted in slamming Ben on the concrete floor, face-first.

61.     Plaintiff was unable to shield himself from impact due to being restrained in handcuffs behind his back.

62.     Plaintiff's teeth were knocked out, and he was rendered unconscious, lying in a pool of blood.

63.     Plaintiff sustained traumatic brain injury, facial fractures, lacerations, and permanent dental damage.

64.     Plaintiff was transported to Cody Regional Health and later transferred to the Billings Clinic Hospital as a Level II trauma patient.

65. The Wyoming Division of Criminal Investigation (DCI) was called to investigate due to the seriousness of Plaintiff's injuries.

66. At all relevant times, the force used against Plaintiff was not reasonably related to any legitimate penological or safety purpose.

## V. CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983 – Fourteenth Amendment Excessive Force
(Against Quick, Sciortino, and Doe Defendants)

67. Plaintiff realleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

68. Title 42 U.S.C. § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. . . .

69. "'[W]hen the State takes a person into its custody and holds her there against her will, the Constitution imposes upon it a corresponding duty to assume some responsibility for her safety and general well-being.'" *Ortiz v. City of Chicago*, 656 F.3d 523, 531 (7th Cir. 2011) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Serv.*, 489 U.S. 189, 199-200 (1989)).

70. At all relevant times, Plaintiff was a pretrial detainee protected by the Fourteenth Amendment.

11

71.     There was no apparent security threat, as the individuals were within a secure correctional facility and the situation involved a two-on-one interaction.

72.     The Defendants did not take steps to de-escalate the incident or limit the use of force applied.

73.     There was nowhere to flee.

74.     Plaintiff was not actively resisting arrest.

75.     The force used by the defendants was objectively unreasonable, disproportionate, and excessive, especially considering that the Plaintiff had complied with orders and was fully restrained.

76.     The force used was excessive under *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

77.     Defendants' actions directly and proximately caused Plaintiff's injuries.

78.     Mr. Burks was harmed as a result of the Defendants' knowing, intentional, reckless and/or deliberately indifferent acts or failures to act and are liable to the Plaintiff pursuant to 42 U.S.C. § 1983 for damages and attorney's fees pursuant to 42 U.S.C. § 1988 as more particularly set forth below in the "Damages" section of this Complaint.

**COUNT II**
**42 U.S.C. § 1983 – Failure to Intervene**
(Against Sciortino and Doe Defendants)

79.     Plaintiff realleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

80.     Each Defendant had a realistic opportunity to prevent the use of excessive force.

81.     Defendants failed to intervene despite knowledge that excessive force was being used.

12

82.    This failure violated Plaintiff's clearly established constitutional rights.

83.    These failures amounted to deliberate indifference to detainee safety.

## COUNT III
### Negligence – Peace Officer Liability
(W.S. § 1-39-112)
(Against all Defendant Quick)

84.    Plaintiff realleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

85.    Defendant Quick owed Plaintiff a duty of reasonable care.

86.    Defendant Quick breached that duty by:

   a.   Using unreasonable, excessive, and unnecessary force against Plaintiff under the circumstances;

   b.   Failing to protect Plaintiff from foreseeable harm, including harm caused by the use of excessive force;

   c.   Failing to de-escalate the encounter when de-escalation was feasible, appropriate, and required by training and policy;

   d.   Failing to employ reasonable alternatives to force, including verbal commands, time, distance, and other non-force options;

   e.   Failing to take into account Plaintiff's restrained status, including that Plaintiff was handcuffed and unable to protect or stabilize himself;

   f.   Applying force in a manner disproportionate to any legitimate safety or penological objective;

   g.   Using force after the need for force had ceased, or when no legitimate need for force existed

13

h.  Failing to intervene to prevent the use of excessive force by other officers when there was a realistic opportunity to do so;

i.  Failing to comply with applicable constitutional standards governing the humane treatment of detainees and prisoners;

j.  Failing to comply with Park County Detention Center policies, procedures, and training, including use-of-force and de-escalation policies;

k.  Failing to properly assess risk and safety factors before applying force;

l.  Failing to exercise reasonable care in controlling Plaintiff's movement, resulting in foreseeable risk of injury;

m.  Failing to provide or summon timely medical evaluation or care following the use of force;

n.  Failing to accurately document, report, or account for the force used, as required by policy and professional standards;

o.  Engaging in conduct that fell below the standard of care expected of reasonable detention officers under similar circumstances.

87.  Plaintiff suffered damages as a direct result.

## VI.  DAMAGES

88.  Plaintiff incorporates and adopts by reference all facts and allegations above as though fully set forth herein.

89.  As a direct and proximate result of Defendants' unconstitutional, willful misconduct, negligence, and acts and omissions set forth herein, Plaintiff sustained the following damages:

a.  Actual economic damages as established at trial;

14

b.    Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, pain and suffering, inconvenience, mental anguish, medical bills, and other non-pecuniary losses;

c.    Punitive damages for all claims as allowed by law in an amount to be determined at trial;

d.    All allowable pre-judgment and post-judgment interest, costs, expenses, and fees associated with this litigation;

e.    Attorney's fees and costs for all claims for relief.

**WHEREFORE,** Plaintiff Mr. Burks prays for judgment against Defendants in an amount supported by the allegations of this Complaint, and to be proven at trial, and for such other and further relief as the Court deems equitable and proper, as follows:

I.    Judgment against Defendants, jointly and severally, for economic damages in an amount consistent with the allegations contained herein and to be proven at trial;

II.    Judgment against Defendants, jointly and severally, for noneconomic damages in an amount consistent with the allegations contained herein and to be proven at trial.

III.    Judgment for punitive damages against each individual Defendant in an amount to be determined by the triers of fact;

IV.    An award of attorney fees and costs for all claims for relief within the Complaint pursuant to 42 U.S.C. §§ 1983, 1988; and

V.    Judgment for costs, interest, and such other and further relief as the Court

15

deems just and equitable.


**DATED** this _____ day of January 2026.


_____
Jack D. Edwards, 6-3877
Kaden B. Canfield, 7-6238
EDWARDS LAW OFFICE, P.C.
PO Box 5345
Etna, WY   83118
307.883.2222
Fax:   307.883.0555
jack@edwardslawofficepc.com
kaden@edwardslawofficepc.com
*Attorneys for the Plaintiff*

16